UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEVON AYERS,

*Plaintiff,*

- against -

THE CITY OF NEW YORK; New York City
Police Department ("NYPD") Detective
MICHAEL DONNELLY (Tax ID # 883801);
and NYPD Detective THOMAS AIELLO
(Tax ID # 868427),

*Defendants.*

# 14 CV 1655

### COMPLAINT AND
### JURY DEMAND

Plaintiff DEVON AYERS, by his attorneys GLENN A. GARBER, P.C., as and for his

complaint, alleges upon information and belief as follows:

## NATURE OF ACTION

1.     This is an action to recover money damages for the violation of Plaintiff's rights

under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

Also raised are supplemental claims under the laws of the State of New York.

2.     It presents claims of malicious prosecution and unfair trial.

3.      This action is related to the wrongful conviction of Plaintiff who served nearly 18

years in prison for two 1995 homicides he did not commit.

4.     This tragedy was caused by the intentional misconduct of Defendant Detectives

MICHAEL DONNELLY and THOMAS AIELLO (hereinafter "Individual Defendants"), and the

City of New York, and involved the invention of a fictitious case, the creation of false evidence

and the commencement and continuation of a prosecution against Plaintiff without probable

1

cause that resulted in his wrongful conviction.

5.     Not only did it result in Plaintiff and seven other people to be incarcerated for nearly two decades for crimes they did not commit, but it enabled the true perpetrators, who were violent gang members, to remain free at large and to murder and victimize other people.

6.     The Individual Defendants, among other things, threatened, coerced, manipulated, bribed, coached, and fed non-public crime facts to witnesses so the witnesses would make false statements and lie in the grand jury and at trial; used improper identification procedures to manufacture a false version of events; intentionally suppressed exculpatory evidence that led to the wrongful and unjust conviction of Plaintiff; and failed to conduct basic and obvious investigation that would have spared Plaintiff, his co-defendants, their families and the families of the victims the devastating consequences of the wrongful convictions, and that could have led to the rightful prosecution of the real perpetrators.

7.     In addition to the individual liability of the Individual Defendants, Defendant City of New York is liable for violations of state law committed by its employees under the doctrine of *respondeat superior.*

## JURISDICTION AND VENUE

8.     This action is brought pursuant to 42 U.S.C. § 1983 and the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

9.     This Court has original subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 42 U.S.C. §§ 1983 and 1988.

10.     Plaintiff invokes this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over State law claims that are part of the same case or controversy giving rise to the federal claims and share the name nucleus of operative facts as the federal claims.

11.     Venue is proper in the United States District Court for the Southern District of New York because the claims arose, and Plaintiff resides, in this district. 28 U.S.C. §§ 1391(a)-(c) and 1402(b).

## CONDITION PRECEDENT TO SUPPLEMENTAL STATE CLAIMS

12.     Plaintiff has complied with all conditions precedent to the commencement of the supplemental state claims, having timely served on or about March 11, 2013, a notice of claim upon the Defendant CITY OF NEW YORK and an amended notice of claim on or about October 29, 2013, pursuant to Section 50-i of the New York General Municipal Law; more than 30 days has elapsed since said service without payment or adjustment or without offer of settlement having been made; having had a hearing pursuant to Section 50-h of the New York General Municipal Law on January 14, 2014; and having brought this action in a timely manner.

## PARTIES

13.     Plaintiff DEVON AYERS is, and was at all times relevant to this action, a resident of the County of Bronx, in the City and State of New York.

14.     Defendant CITY OF NEW YORK ("CITY") is and was at all times relevant herein a municipal corporation existing under and by virtue of the laws of the State of New York, and having the powers and duties imposed by law thereon, situated in the Southern District of New York.

15.     Defendant DETECTIVE MICHAEL DONNELLY (Tax ID # 883801) is, and was at all relevant times herein, a duly appointed agent, employee, officer, and servant of the NYPD. Defendant DONNELLY is being sued in his individual capacity.

16.     Defendant DETECTIVE THOMAS AIELLO (Tax ID # 868427) is, and was at all times relevant herein, a duly appointed agent, employee, officer, and servant of the NYPD.

Defendant AIELLO is being sued in his individual capacity.

17.     At all relevant times herein, the aforementioned Defendants acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York, and within the scope of their employment.

18.     At all relevant times herein, defendants acted jointly and in concert with each other. Each defendant had the duty and the opportunity to protect Plaintiff from the unlawful actions of the other defendants, but each defendant failed and refused to perform such duty, thereby proximately causing Plaintiff's injuries.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Overview and Procedural History

19.     On January 17, 1995, Denise Raymond, a thirty-eight year old Federal Express executive, was murdered in her apartment at 880 Boynton Avenue in the Bronx.

20.     On January 19, 1995, Baithe Diop, a livery cab driver, was killed in the driver's seat of his cab on Croes Avenue, approximately four blocks from Raymond's apartment.

21.     Plaintiff was indicted for both the Raymond and Diop murders, and related charges.  The indictment was filed on March 14, 1995 (Bronx Indictment 1086-95).

22.     Plaintiff was subsequently arrested on March 16, 1995 after he voluntarily surrendered at the 43 Precinct in the Bronx because he was informed that the police were looking for him.

23.     He has always maintained his innocence.

24.     Plaintiff was one of seven defendants who the Individual Defendants – the detectives that investigated the case – caused the Bronx County District Attorney's Office to wrongfully prosecute.

4

25.     He was tried together with codefendants Michael Cosme, Carlos Perez, and Israel Vasquez for conspiring to and committing the Raymond and Diop murders.  Both homicides were joined together in a single trial as to Plaintiff, Cosme, Perez and Vasquez.  All were convicted of both murders, except Vasquez who was convicted of the Raymond murder only and acquitted of the Diop murder.[1]

26.     Cathy Watkins and Eric Glisson were tried together of the Diop murder only, and both convicted.  And, Charles McKinnon was tried separately of the Raymond murder only and acquitted.

27.     No physical evidence tied Plaintiff or the other the criminal defendants to either murder or the murders to one another.

28.     Nonetheless, the prosecution theorized based on concocted and erroneous information provided by the Individual Defendants that Plaintiff and his co-defendants participated in each murder.  It argued that the Diop murder was 'set up' by Cathy Watkins who called the car service that Diop worked for, and that the Raymond murder was committed at the behest of Charles McKinnon, who had a motive to kill the victim because she was his ex-girlfriend.

29.     The prosecution's case against Plaintiff and his co-defendants was based on the testimony of Cathy Gomez, Miriam Tavares, and Kim Alexander, witnesses who were manipulated and pressured to lie by the Individual Defendants.

30.     Gomez's testimony, as argued by the prosecution at trial, established the critical connection between the Diop and Raymond murders: she claimed falsely to have overheard Plaintiff and his co-defendants conspire to commit both crimes, and then later, confess to both.

---

[1] Vasquez's conviction was ultimately reversed and the indictment against him dismissed due to insufficiency of the evidence.  *People v. Vasquez,* 43 A.D. 3d 348 (1st Dep't 2007).

31.     Tavares testified falsely at trial, also due to pressure and manipulation by the Individual Defendants, that she observed Plaintiff and his co-defendants participate in the Diop robbery and shooting, and vaguely claimed to have overheard them confessing to the Raymond murder.

32.     Alexander provided a motive for the Raymond murder: that she was killed by her ex-boyfriend and scorned lover Charles McKinnon.  Alexander falsely linked McKinnon to the alleged conspiracy by recounting an argument she had allegedly witnessed between Raymond and McKinnon in Raymond's office building on the evening of the murder.

33.     Based upon the false testimony of Gomez, Tavares and Alexander, manufactured and fed to them by the Individual Defendants who were bent on solving the Raymond murder and Diop murder that they connected to the Raymond murder without any basis in fact, Plaintiff was wrongfully convicted by a jury of second degree murder for the 1995 homicides of Raymond and Diop.

34.     On May 13, 1997, Plaintiff was sentenced to 50 years to life in prison.

35.     On October 24, 2000, the Appellate Division, First Department, upheld Plaintiff's conviction.  *People v. Ayers,* 276 A.D.2d 392 (1st Dept. 2000).  Leave to appeal in the New York State Court of Appeals was denied on December 5, 2000.  *People v. Ayers,* 95 N.Y.2d 960 (2000).

36.     Gomez recanted, disavowing her original statements to the police, and her grand and trial testimony.  She cited threats by Individual Defendants of retaliation against her family as the reason for her false statements and false grand jury and trial testimony.[2]

---

[2] Gomez first recanted in 1997, which was the subject of a C.P.L. §330.30 motion.  That motion was denied on April 15, 1998.  She reaffirmed her recantation in 2010 and 2012.

37.    It was also revealed after trial that a security video from Raymond's office on the night of her death disproves Alexander's testimony linking McKinnon to the Raymond murder and establishes that he was *not* there arguing with Raymond on the evening she was killed.  This evidence was not turned over to the defense despite the fact that it was possessed by Defendant Aiello.

38.    In addition, after Plaintiff's trial it was discovered that two federal cooperators, Gilbert Vega and Jose Rodriguez committed the Diop homicide in 1995 when they were members of a Bronx gang, Sex, Money, Murder ("SMM").  Years later, they agreed to cooperate with the Office of the United States Attorney for the Southern District of New York ("USAO") in its investigation into SMM's criminal activities.  As part of their cooperation agreements, both men were required to disclose to the USAO all of their past criminal conduct.

39.    Hence in 2003, Vega and Rodriguez each independently admitted to robbing and shooting an African livery cab driver on Croes Avenue at approximately the same time that Diop was killed.  Specifically, both men informed the USAO that they had been visiting a girl Rodriguez knew in Harlem before taking the livery cab to the Bronx; that on their way home in the cab, they decided to rob the driver and directed him to the area on Croes Avenue where the murder occurred; that upon demanding money from the driver, an argument and struggle ensued; that Rodriguez shot the driver; that Vega fired his weapon immediately thereafter; and that both men fled from the vehicle, which continued traveling slowly up Croes Avenue toward Lafayette Avenue.

40.    Following their proffers, Federal investigator John O'Malley contacted the Bronx Homicide Task Force to ascertain whether the victim had died from the gunshots, which Vega

and Rodriguez believed likely.[3] Despite his repeated inquiries neither the Task Force nor the NYPD's 43rd precinct advised him of any link to the Diop homicide.  Since the USAO had no proof that death resulted from the robbery, Vega and Rodriguez only were required to plead guilty to using firearms to commit a robbery and were sentenced accordingly.  At their separate plea hearings in 2003 and 2008, each provided additional details about the Diop crime which are consistent with the evidence in Plaintiff's criminal trial, including that they had stolen a cell phone and radio from the driver.

41.     In May 2012, the USAO received a letter from co-defendant Glisson (who had been tried separately with Cathy Watkins for the Diop murder) in which he asserted his innocence and requested assistance investigating rumors that SMM members had killed Diop. Investigator O'Malley recognized that the crime described by Glisson was the same one to which Vega and Rodriguez had pled guilty years before and for which both had already served their sentences.  When Investigator O'Malley contacted them, both confirmed the truth of their prior confessions and provided additional details also consistent with the evidence in the Diop murder.

42.     Based upon claims of newly discovered evidence, *Brady* violations and actual innocence, on October 19, 2012 Plaintiff moved in New York State Supreme Court pursuant to C.P.L. § 440.10(1)(g), (f) and (h) to vacate his convictions.  Similar motions were also brought by Michael Cosme, Carlos Perez, Cathy Watkins and Eric Glisson.

43.     These motions along with the urging of the USAO and defense counsel led the Bronx County District Attorney's Office (BCDA) to reinvestigate the Raymond and Diop homicides.  That reinvestigation initially resulted in the BCDA dismissing the Diop murder

---

[3] John O'Malley, the investigator who worked on the case and the reinvestigation for the USAO, is a former detective of the NYPD.

conviction against Plaintiff and his co-defendants on December 12, 2012.    Plaintiff was subsequently released from jail on January 23, 2013.[4]

44.    Further reinvestigation by the BCDA, which included DNA testing that excluded Plaintiff, his co-defendants, Glisson and Watkins as perpetrators of the crimes, culminated in the dismissal of the Raymond murder against Plaintiff and his co-defendants on September 20, 2013.

45.    This action follows which claims that Defendants, through their deliberate and malicious misconduct, caused the false arrest, malicious prosecution, unfair trial, imprisonment and wrongful conviction of Plaintiff in violation of his federal constitutional rights and state law.

## The Police Investigation

46.    Denise Raymond came home to her apartment, in the Soundview area of the Bronx, after work on the evening of January 17, 1995.  Based on the crime scene investigation, it appeared that Ms. Raymond was accosted as she entered her apartment on Boynton Avenue, after which she was dragged to her bedroom, handcuffed, blindfolded, and gagged, and then shot twice in the head.

47.    Two days later, at approximately 4:30am on January 19, 1995, Baithe Diop—a Senegalese livery taxi driver who had no connection to Ms. Raymond—was found dead in his cab on Croes Avenue between Lafayette and Seward Avenues in the Bronx.  He had been shot twice, once in the upper back and once in his right side.

48.    Defendants Donnelly and Aiello, detectives employed by the NYPD, investigated the two homicides.  Defendant Aiello was the "lead" detective assigned to the Raymond murder, while Defendant Donnelly was the "lead" detective assigned to the Diop murder.  The two worked together closely and investigated the crimes in tandem.  In fact, the two detectives worked together so closely that the prosecution at Plaintiff's trial stipulated that the defense

---

[4] The Diop murder was dismissed against Glisson and Watkins on December 13, 2012.

could "pose any questions to Donnelly which they could pose to Aiello, and I'm not going to object on the grounds that it's Donnelly versus Aiello."

49.     During the investigation, the Individual Defendants repeatedly questioned two supposed "witnesses": a teenager named Cathy Gomez and a woman named Miriam Tavares.

50.     In January 1995, Ms. Gomez was repeating ninth grade for the second time; she would never complete it.  She was enrolled in school, but she rarely attended class and could not read or write English.

51.     Ms. Tavares was a neighborhood drug addict who spoke only Spanish.

52.     Playing on the two women's vulnerabilities, Defendants Donnelly and Aiello coerced, cajoled, and bribed them to provide what the Individual Defendants knew was false testimony with the purpose of obtaining Plaintiff's unlawful arrest, wrongful conviction, and unjust imprisonment.

53.     The Individual Defendants also relied heavily on a third alleged witness, Kim Alexander.  Ms. Alexander had been a co-worker of Denise Raymond's.  She claimed that she left work with Ms. Raymond on January 17, 1995, shortly before Ms. Raymond was murdered. Ms. Alexander claimed that as she and Ms. Alexander exited their office building, an African-American man (whom she subsequently identified as Charles McKinnon) appeared and began harassing Ms. Raymond.  Alexander's story bolstered the Individual Defendants' theory that McKinnon masterminded the Raymond murder and ordered Plaintiff and his co-defendants to carry it out.

54.     But Mr. McKinnon had not been at Raymond and Alexander's workplace the night of the murder, and the Individual Defendants knew it.  Defendant Aiello had viewed surveillance footage from the building, recorded on the night in question, which showed Ms.

Alexander and Ms. Raymond leaving together—and showed Ms. Raymond wearing the exact outfit and carrying the exact parcels Ms. Alexander's testimony described—with no African-American man anywhere in sight.  Knowing this evidence would undermine the fabricated case against Plaintiff and his co-defendants, Defendant Aiello suppressed the footage and falsely told prosecutors it showed nothing of value to the investigation.

55.     Defendants used a series of unconstitutional and improper tactics to secure Plaintiff's indictment and conviction.   These tactics included, but were not limited to: questioning Cathy Gomez and Miriam Tavares together and using Cathy Gomez as a translator for Miriam Tavares, thereby tainting both women's accounts; feeding Gomez and Tavares details about the crime scenes and police investigation that were unknown to the witnesses and then coercing them to testify that they learned the information from Plaintiff and his co-defendants; threatening to unjustifiably jail Ms. Gomez's parents and interrogating her fifteen-year-old brother and threatening to prosecute him; using suggestive witness identification procedures; giving both women, who were indigent, financial incentives to provide false incriminating evidence; and failing to turn over exculpatory evidence, including the surveillance video that disproved Ms. Alexander's testimony, to the prosecution.  The Individual Defendants knew the testimony upon which the case against Plaintiff relied was false.

## Cathy Gomez

56.     In order to achieve their goal of inculpating Plaintiff, the Individual Defendants forced Cathy Gomez to lie about his involvement in the Raymond and Diop murders.

57.     Even before Plaintiff was arrested, Ms. Gomez specifically told Defendant Donnelly that she had no independent personal knowledge of any facts relating to the Raymond

murder.  Indeed, she did not even know the murder occurred until Defendant Donnelly told her about it.

58.     Yet after meeting repeatedly with the Individual Defendants, Cathy Gomez gave a slew of false statements concerning Plaintiff and his co-defendants, including both before the Grand Jury and at trial.

59.     On February 1, 1995, Gomez allegedly made a statement that Plaintiff and a co-defendant were present in a park with Gomez on January 19, 1995, when a co-defendant confessed to killing a cabdriver.

60.     Defendant Donnelly required Ms. Gomez to sign the statement, but did not read it to her or translate it for her, even though he knew she could not read English.  Moreover, Defendant Donnelly knew the statement to be false, and required Ms. Gomez to sign it anyway.

61.     Around the same time, the Individual Defendants also attempted to force Cathy Gomez's brother, Hanley Gomez, Jr., to falsely implicate Plaintiff and his co-defendants.  As with Cathy Gomez, Defendants Donnelly and Aiello attributed statements to Hanley that he had never made and caused him to sign them without understanding their contents.  But unlike his sister, Hanley Gomez, Jr. resisted the Individual Defendants' threats and coercion and refused to participate in the Grand Jury and trial proceedings against Plaintiff (and tried unsuccessfully to convince his sister to do the same) because he knew the facts attributed to him and to his sister were false.

62.     At the grand jury Gomez testified falsely at Individual Defendants' behest and based on crime facts that they fed to her.  She testified that Plaintiff was present with his co-defendants in a park after the Raymond murder, that she saw him in  possession of Raymond's credit card, and that he discussed filming the murder with a camcorder; that she overheard

Plaintiff talking on the street and that he said he handcuffed Raymond, that punched her in the face, that he brought her into a bedroom, and a co-defendant said that he put a pillow over her mouth; that Plaintiff told her at one point that he took jewelry from Raymond; and that she learned that Plaintiff ate a sandwich and drank fruit punch when inside Raymond's apartment.

63.    The Individual Defendants met with Ms. Gomez repeatedly, coaching her to make false statements implicating Plaintiff in the Raymond and Diop murders.  For example, they told her, and she testified falsely at trial, that she had seen a group of men discussing and bragging about the Raymond murder after the fact and passing around a VCR, credit card, and jewelry stolen from Ms. Raymond's apartment; that Plaintiff was present in a co-defendant Cosme's apartment on January 17, 1995, when she overheard them and unidentified others conspiring to commit the Diop and Raymond murders; on the following day, she was in the park and overheard Plaintiff admit that he had knocked on Raymond's door and "punched her out;" and that on January 20, again in the park, Plaintiff showed her Raymond's "credit card" and may have been in possession of her stolen VCR.

64.    Because Gomez's testimony at the grand jury and trial was manufactured by the Defendants and not actually a statement of her personal knowledge, it was largely incoherent and self-contradictory.

65.    Nevertheless, the prosecution assured the jury that—in spite of problems with her testimony—Ms. Gomez must have been telling the truth because she otherwise could not have known several non-public details about the murders.  For example, she knew about specific items that were stolen from the victims (a VCR and a credit card from Ms. Raymond, and a cell phone from Mr. Diop), and she knew that Ms. Raymond's murderers had drunk juice and snacked on sandwiches in Raymond's apartment after shooting her.

13

66.     Ms. Gomez has since admitted that she did not actually learn these details from Plaintiff and his co-defendants; rather, she learned them from Defendants Donnelly and Aiello. The Individual Defendants showed Ms. Gomez crime scene photographs.  They told her about specific items that were stolen from the victims, and explained that crime scene evidence suggested that Ms. Raymond's murderers had eaten sandwiches and drank juice in her apartment during or after the murder.

67.     The Individual Defendants then coerced Ms. Gomez to lie and claim that her knowledge of these and other details came from inculpatory statements she overheard Plaintiff and his co-defendants making.

68.     Ms. Gomez's testimony was entirely fabricated.  She now admits that she had never been to co-defendant Cosme's house, much less witnessed a meeting at which two murders were planned; that she had never seen any of the defendants with a gun or stolen items; that she had never overheard anyone admitting to perpetrating the Raymond or Diop murders; and that she learned about the stolen items, the sandwich and juice, and other non-public crime scene details from the Individual Defendants.  Plaintiff never told Ms. Gomez that he was involved in any murders and never confessed because he is innocent. Ms. Gomez has admitted all of this in sworn testimony and has confirmed that she was forced to lie by the Individual Defendants.

69.     Ms. Gomez's recantation has been corroborated by her brother, Hanley Gomez, Jr., who since at least 2004 has maintained that the Individual Defendants coerced him to sign statements without understanding their contents and forced his sister to perjure herself.

70.     When Ms. Gomez tried to refuse Defendants' demands that she give false testimony, they threatened her and warned her that her family would get in trouble if she got

"stupid."  Defendant Donnelly threatened Ms. Gomez that her brother would be accused of the murders if she did not cooperate in Defendants' scheme to frame Plaintiff and his co-defendants.

71.     Defendants threatened to jail Ms. Gomez and to have her parents deported if she did not provide perjured testimony to further their fabricated theory of the case.

72.     Ms. Gomez testified falsely because she was threatened, coerced, and intimidated by the Individual Defendants to lie.  Defendants Donnelly and Aiello knew that her testimony was false.

73.     Plaintiff was arrested, prosecuted, and convicted largely on the basis of Ms. Gomez's false statements, which were fabricated by the Individual Defendants.

### Miriam Tavares

74.     Ms. Tavares's testimony was also fabricated by Defendants.  The Individual Defendants caused Plaintiff to be arrested and prosecuted for the Diop murder largely on the basis of Ms. Tavares's fabricated statements too, even though those statements were uncorroborated and implausible, and even though the Individual Defendants knew them to be false.

75.     At the Individual Defendants' behest, Ms. Tavares claimed that she witnessed the Diop homicide in intricate detail while perched on top of her toilet, looking out through a four-inch crack in her bathroom window 300 feet away from where Mr. Diop's vehicle crashed after he was shot.  She claimed that Plaintiff and at least five other people surrounded the cab, shot Mr. Diop, and stole his belongings.  She lied about this at the grand jury and at trial.[5]

76.     Her statements were not only implausible on their face; they were even less believable because the information attributed to her changed drastically over the course of the "investigation."  With each new statement, Tavares added new details and changed other ones,

---

[5] At the grand jury Tavares said that Glisson passed the gun to Plaintiff that Glisson used to shoot Diop.

15

placed new "perpetrators" at the scene, and inserted narrative flourishes that rendered her account a cartoonish farce.  This evolution in Ms. Tavares's account was attributable to the coaching of Defendants, who encouraged her to lie.

77.     Over the course of multiple statements to the police, three separate days of Grand Jury testimony, and trial testimony, Ms. Tavares's story changed wildly.  Her first statement claimed that she was lying down putting her son to bed at the time of the Diop murder, heard a gunshot, and thereafter walked to her bathroom window where she observed a second shot and saw Plaintiff and another individual running towards her.  But in subsequent statements, she added numerous precise details about the exact manner in which she claimed to have seen the murder unfold.  Over the course of more than half a dozen statements, Ms. Tavares changed: the number of "perpetrators" who were present; whether any of those individuals gesticulated or made verbal statements, and what they were; where the shooters were positioned; whether the "perpetrators" were holding items and what they were; what items were taken from inside the cab and who took them; how many vehicles were present and who was in them; and numerous other details.  At trial, she even mentioned for the first time that she was sitting outside on her stoop when Mr. Diop's taxi pulled up near her building, enabling her to see everyone who was present in pristine detail.

78.     Putting aside its ridiculous internal inconsistencies, Ms. Tavares's account was completely divorced from the reality of what the Individual Defendants knew or should have known about the Diop murder based on objective evidence.  For example:

a.      Ms. Tavares claimed that Mr. Diop's taxi was stationary outside her apartment when the shooting occurred.  But crime scene evidence showed that the taxi was still moving when Mr. Diop was shot and subsequently traveled several hundred feet, colliding with several objects along the way, before coming to rest.  The actual scene of the shooting was not visible *at all* from Tavares's vantage point.  The Individual Defendants intentionally ignored this obvious fact and failed to even review the crime

scene report.

b.      Ms. Tavares stated that co-defendant Cosme shot Mr. Diop in the legs while standing outside of the driver's side of the cab.  But the crime scene evidence, of which the Individual Defendants were or should have been aware, showed that Mr. Diop was shot from behind (i.e. by someone seated in the back seat), in the back and right side (i.e., the passenger side).

c.      Ms. Tavares stated that six perpetrators were present at the crime scene, but two other eyewitnesses had told the police that they only saw one or two individuals fleeing. The Individual Defendants failed to follow up with the other two eyewitnesses.

79.     The Individual Defendants knew that Ms. Tavares's fake story was not a valid basis to suspect Plaintiff of wrongdoing.  They knew it because it was they who told her to lie. The variations in Ms. Tavares's statements, and their inconsistency with the physical evidence, are attributable to the fact that she was not actually describing events she had observed.  Rather, she was imperfectly attempting to regurgitate a story that Defendants had fed to her.  On at least one occasion, Defendant Donnelly even hand-wrote a statement to be signed by Tavares, who could not read or understand English.  There is no evidence that the statement was ever translated for her.

80.     The Individual Defendants gave Ms. Tavares, who was destitute, financial incentives to give false testimony.  They also exploited her personal bias against Eric Glisson, a co-defendant, to procure false inculpatory testimony.  The Individual Defendants knew that Ms. Tavares's statements were completely fabricated.

81.     As they had with Cathy Gomez, the Individual Defendants fed non-public details about the murders to Ms. Tavares to make her otherwise implausible, inconsistent testimony appear credible.

82.     But Mr. Diop was not murdered by Plaintiff or any of his co-defendants.  He was murdered by two gang members, acting alone, who later confessed.  None of the people Ms.

Tavares accused had anything to do with the murder.

83.     That fact came to light when the USAO re-investigated the Diop case in response to pleas from Eric Glisson.  Using basic investigative techniques that Defendants should have utilized in 1995 had they been acting with ordinary investigative competence, the USAO's investigation solved the Diop murder and exonerated Plaintiff and his co-defendants.

84.     As part of their cooperation with the USAO's investigation into SMM in the late 1990's and early 200s, Vega and Rodriguez were required to admit all of their past criminal activity, and by 2003 both had confessed to shooting and robbing a livery cab driver on Croes Avenue in the Bronx in the winter of 1994-1995.  Following these confessions, the federal authorities spoke multiple times to the detective squad at the 43rd Precinct, where Defendants Donnelly and Aiello worked, attempting to confirm Vega and Rodriguez's information and to close what they imagined was an unsolved shooting investigation.

85.     No one at the 43rd Precinct or Bronx Homicide told the federal authorities about the Diop case, even though Detective Donnelly worked for the Bronx Homicide Task Force in 2003.  The federal authorities were instead told that no files matched the facts Vega and Rodriguez had provided.

86.     In the spring of 2012, the USAO learned for the first time from Eric Glisson that he, Plaintiff, Cathy Watkins, Carlos Perez, and Michael Cosme were in prison for a murder that bore an uncanny resemblance to the taxi driver murder to which Vega and Rodriguez had confessed years earlier.

87.     The U.S. Attorney's chief investigator on the case has noted that "every undisputed fact regarding the Diop homicide corresponds to and corroborates the account given by" Vega and Rodriguez, including the time and approximate date of the shooting, the fact that

the victim was an African livery cab driver, the pick-up and drop-off locations, the "exact location" of the shooting, the ballistics, crime scene, and medical evidence, Diop's screams as the robbery unfolded, the cab's collision with a parked car and a trash dumpster, and the theft of a cell phone from the driver (with calls made to people associated with Vega and Rodriguez).

88.    That investigator has also observed that the case against Plaintiff and his co-defendants rested heavily on "the testimony of Miriam Tavarez [sic], a witness with an obvious bias, who told materially different stories on different occasions, whose testimony was inconsistent with the physical evidence, and who gave what I believe, based on my experience and my familiarity with the location of the homicide, to be highly questionable testimony about her ability to perceive the events of that night and what she actually did see, if anything."

89.    Had the Individual Defendants conducted a proper investigation, Vega and Rodriguez would have been imprisoned for the Diop murder instead of Plaintiff and his co-defendants.  For example, the Individual Defendants could have reviewed phone records showing calls made from Mr. Diop's stolen cell phone after he was murdered.  The police possessed those records at the time of the 1995 investigation.  Those records would have shown (and do show) that Mr. Diop's phone was used to make several calls to associates of Vega and Rodriguez, who were notorious members of a violent gang that operated in the neighborhood where Mr. Diop was shot.  In fact, one call was made to the home of Rodriguez's mother—where Rodriguez and Vega were both living at the time.

90.    Plaintiff's defense attorney was never provided with these exculpatory phone records at the time of his criminal trial.

91.    Because the Individual Defendants were too busy knowingly concocting a false case against Plaintiff and his co-defendants and relying on statements by Ms. Tavares which they

knew to be false, the Individual Defendants failed to exercise the basic competence that would have solved the Diop murder.  That left the true perpetrators, Vega and Rodriguez, free to continue committing violent crimes in the Bronx for years.  For example, Jose Rodriguez was one of the shooters in the infamous "Thanksgiving Murders" in November 1997 in the Bronx, in which two people were killed during an annual football game between residents of two public housing complexes.

92.     Instead of apprehending Vega and Rodriguez and preventing these later murders, the Individual Defendants framed Plaintiff, causing him to spend almost eighteen years in prison for crimes he did not commit.

### Kim Alexander's Testimony and Defendants' Withholding of *Brady* Material

93.     The third key "witness" against Plaintiff was Kim Alexander, who testified that she had witnessed a man she identified as Charles McKinnon harassing Denise Raymond as Raymond left work on the night she was murdered.

94.     To support the charges against Plaintiff, the Individual Defendants sought to establish a link between Mr. McKinnon and Ms. Raymond—who knew each other and who had been romantically involved a number of years before the murder—and to link McKinnon to Plaintiff and his co-defendants, Israel Vasquez, Michael Cosme, and Carlos Perez.  They invented "facts" to "show" that Plaintiff and his co-defendants carried out the Raymond murder at McKinnon's behest.  It was the only attempt ever made to establish a motive for Plaintiff to show up at the apartment of Ms. Raymond, a stranger, and participate in her murder.

95.     Defendants pursued this strategy because there was no evidence to connect Plaintiff and his co-defendants to Ms. Raymond.  Plaintiff was in his late teens, while Ms. Raymond was a thirty-eight-year-old Federal Express executive.  There was no evidence to

connect Plaintiff and his co-defendants—all teenagers or young men—with Ms. Raymond, who moved in entirely different social circles.

96.     In furtherance of their plan, the Individual Defendants forwarded false information to prosecutors purporting to demonstrate that McKinnon stalked and harassed Denise Raymond immediately prior to her death, and that he orchestrated the murder with what Defendant Aiello described as a group of "younger boys."

97.     Defendants relied on Ms. Alexander, a co-worker of Ms. Raymond's, who testified before the Grand Jury, at Plaintiff's trial, and at the trial of Charles McKinnon, to support their theory that McKinnon orchestrated Ms. Raymond's death.

98.     According to Ms. Alexander, she and Ms. Raymond left work together on the evening Ms. Raymond was killed.  She testified that as they waited on an upper floor of the Federal Express building for the elevator, a man, whom Ms. Raymond apparently knew, but who was a stranger to Ms. Alexander, suddenly appeared.  Ms. Alexander testified that she remained with Ms. Raymond and the man as they waited for the elevator.  The three then rode the elevator down to the lobby together, and exited the building at the same time.

99.     Ms. Alexander testified that Ms. Raymond appeared upset and agitated with the man throughout the entire encounter, and told him to leave her alone.

100.    Ms. Alexander testified that the man followed Ms. Raymond as she walked away from their office building, and that after this encounter, she never saw Ms. Raymond alive again.

101.    Ms. Alexander described the man in the elevator as a tall dark skinned man in his mid-thirties to early forties, wearing a trench coat.  Using highly suggestive identification methods, Defendant Aiello eventually managed to convince Ms. Alexander to identify that man as Charles McKinnon.

102.     Ms. Alexander presented powerful evidence to the Grand Jury and at Plaintiff's trial to establish that McKinnon "set up" Ms. Raymond to be killed by Plaintiff and his co-defendants.

103.     At Plaintiff's trial, Ms. Alexander's testimony was the sole evidence presented regarding Mr. McKinnon's alleged contact with Ms. Raymond on the night of the murder.

104.     This alleged meeting between Ms. Raymond and Mr. McKinnon was also the sole overt act alleged in the indictment to have been committed by McKinnon to support a charge of conspiracy between McKinnon, Plaintiff, and the other defendants, and thus link the unrelated crimes together.  This link also gave the prosecutor the opportunity to use manufactured evidence from one crime to bolster the other and the credibility of the lying witnesses.

105.     But the basis for this conspiracy theory was completely false.  Mr. McKinnon never had an encounter with Ms. Raymond and Ms. Alexander on the night Ms. Raymond was murdered—and the Individual Defendants knew it.

106.     Security surveillance footage from the Federal Express office building in Manhattan showed that Ms. Alexander and Ms. Raymond left the elevator together, alone, on the night in question.  Mr. McKinnon was nowhere in sight, and the surveillance tape shows that he was not present.

107.     The Individual Defendants knew that their conspiracy theory was false because, shortly after Ms. Raymond's murder, Defendant Aiello viewed the security tapes at the Federal Express building and took possession of the tapes.  He knew that Ms. Raymond did not encounter Mr. McKinnon on the night of her murder, as Ms. Alexander claimed, because he saw Ms. Alexander and Ms. Raymond exit the elevator and the office building on the day in question and no black man was present.   Upon information and belief, Defendant Donnelly also knew

that the security tape undermined Ms. Alexander's testimony.

108.    Knowing that this evidence completely undermined their conspiracy theory against Plaintiff and his co-defendants, the Individual Defendants deliberately suppressed the security tapes by failing to "voucher" them in violation of NYPD policy and falsely informing the prosecutor, ADA Daniel McCarthy, that the footage showed nothing relevant to the investigation.

109.    Defendant Aiello completed a Police Department report falsely claiming that Ms. Raymond did not appear on the security tape.  As a result, Plaintiff, the Grand Jury, and the trial jury never knew that there existed objective evidence contradicting the prosecution's theory that Mr. McKinnon orchestrated and set up Ms. Raymond to be murdered by Plaintiff and his co-defendants.

110.    These tapes should have been turned over to the defense at Plaintiff's trial under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  The footage undermined the prosecution's theory that Charles McKinnon set up the Raymond murder and enlisted Plaintiff, Cosme, Perez, and Vasquez to carry it out.  But this evidence was never disclosed to Plaintiff at any point.

111.    More than one year after Plaintiff's conviction, Ms. Alexander testified at McKinnon's trial and presented testimony that was the same in sum and substance as her testimony during Plaintiff's trial.  At the close of evidence in the McKinnon trial, and in response to the Court's inquiry, the prosecutor (based on false information provided by Defendant Aiello) represented to the Court that Defendant Aiello had met with Ms. Alexander to view a surveillance tape at the Federal Express building, but did not take the tape into police custody because Defendant Aiello did not see Ms. Raymond, Ms. Alexander, or Mr. McKinnon on the

23

tape.[6]

112.    The Court ordered the prosecutor to once again "specifically ask" Defendants

Donnelly and Aiello whether they had taken the tape into police custody, and whether Ms.

Raymond did in fact appear on it.

113.    At the same time, the Court gave permission for McKinnon's defense attorney to

call an additional witness, a Federal Express security guard, referred to as "Mooney."

McKinnon's defense attorney stated that this guard would testify that he viewed the surveillance

tape with Defendant Aiello and Ms. Alexander; that the tape had, in fact, been taken into police

custody by Defendant Aiello; and that it showed Ms. Alexander and Ms. Raymond exiting work

alone.  Only then did Defendant Aiello admit to the prosecutor that he had, in fact, taken

possession of the tape.  The prosecutor then disclosed the tape to McKinnon's counsel.

114.    After the tapes were disclosed for the first time at the close of Mr. McKinnon's

trial, the Court held that the tapes were *Brady* material, and that it was a "serious" violation to

fail to produce this evidence.  The Court stated that the failure to turn over the tape sooner was

grounds for a mistrial.

115.    During the McKinnon trial, the parties stipulated that Defendant Aiello had

concealed evidence from the Bronx District Attorney's Office, which resulted in the prosecutor's

failure to disclose this *Brady* material.  The stipulation, in effect, stated that Defendant Aiello

lied by telling the prosecutor that he had viewed the tape but did not seize it, and by telling the

prosecutor that he "did not see the deceased, Kim Alexander or [McKinnon]" in the tape, when

in fact the tape showed Ms. Alexander and Ms. Raymond leaving the elevator together with

Charles McKinnon nowhere in sight.

---

[6] The trial transcripts in the McKinnon case which document the *Brady* violation were unsealed in September, 2012, and provided to Plaintiff during his post-conviction litigation in New York State Supreme Court.

116.    During their deliberations, the jury in McKinnon's trial asked to hear all the testimony about Ms. Raymond's departure from her office on the day of her death again and asked numerous questions about the footage.  Then, having heard the exculpatory evidence at Mr. McKinnon's trial—as well as the fact that the lead detective in the Raymond investigation, Defendant Aiello, had concealed evidence from the prosecutor—the jury, showing a lack of confidence in the prosecution's case, acquitted McKinnon of all charges.

117.    However, the exculpatory evidence was never produced at Plaintiff's trial or at any point during Plaintiff's appeal of his conviction, even though Ms. Alexander presented substantively identical testimony at Plaintiff's trial and before the Grand Jury as she had at McKinnon's trial.

118.    During Plaintiff's trial, the jury was never informed that Mr. McKinnon did not, in fact, illicitly enter Ms. Raymond's workplace the night of her murder, argue with her, and then follow her home.  They were left with uncontradicted evidence supporting the prosecution's theory that McKinnon had a strong motive for the murder, and that he then conspired with Plaintiff to carry out the murder.

119.    Had this *Brady* material been presented to the Grand Jury or during Plaintiff's trial, as it should have been, it is highly unlikely that he would have been prosecuted or convicted, much less remained wrongfully incarcerated for almost eighteen years.  Once Kim Alexander's testimony had been discredited, there was not a shred of evidence to establish a motive for Ms. Raymond's murder.  Indeed, there was no evidence to otherwise connect Plaintiff to Ms. Raymond in any way.

### Defendants' Malice and Deliberate Indifference

120.    The Individual Defendants' failure to undertake even basic investigation tasks

confirms their indifference to Plaintiff's innocence and their improper reliance on testimony they knew to be false. For instance, Defendants never went to Ms. Tavares's apartment to see whether it was even possible for Ms. Tavares to observe what she claimed to have seen from her apartment building, particularly on a dark and rainy night. They never followed up with other witnesses whose version differed starkly from Ms. Tavares's description. They did not review the Diop crime scene report, which would have showed that Diop's cab moved hundreds of feet after he was shot, undermining Tavares's claim that she could see where the shooting occurred from her apartment.

121.    Defendants' malice is confirmed by their behavior throughout the investigation. They deliberately ignored investigative leads that would have proved Plaintiff's innocence. For instance, Defendants never questioned or otherwise investigated an individual who pawned a bracelet with the word "Denise" and Ms. Raymond's birthday engraved on it shortly after Ms. Raymond's murder. They never followed up on records of outgoing calls made from Mr. Diop's stolen cell phone—which would have led them to the real shooters, Vega and Rodriguez. Nor were those records ever turned over to Plaintiff's defense.

122.    The Individual Defendants also relied exclusively on obviously unreliable and inconsistent witness statements; invented a connection between two unrelated murders without any evidentiary basis; threatened witnesses to obtain testimony favorable to their theory; used one witness as a language interpreter for another, despite the obvious risk that each witness's account would be tainted; fed non-public crime scene details to the "witnesses" to make them appear more credible; and failed to voucher and timely disclose the surveillance tape, among other misconduct.

123.    The Individual Defendants also used patently unreliable identification techniques.

For instance, they showed Ms. Gomez and Ms. Tavares a single photograph of Charles McKinnon so that they would later "identify" him in a line-up.  After Ms. Alexander told Defendant Aiello that she had seen Ms. Raymond speaking with a man in a trench coat, he showed her a photo array in which McKinnon was the only person depicted wearing such a coat. When Alexander told Aiello she could not make a positive identification, he declined to conduct a line-up and instead showed Ms. Alexander video footage of McKinnon with his family.  And Defendant Donnelly arrested Cathy Watkins after conducting an improper and highly suggestive voice identification procedure wherein Watkins's voice was the sole sample.

124.    Defendants knew or should have known that they did not have probable cause to arrest and prosecute Plaintiff for either homicide because they deliberately used constitutionally impermissible practices to manufacture evidence against him that they knew to be false.  There was no physical, circumstantial or testimonial evidence linking Plaintiff to either crime. Nevertheless, Defendants caused Plaintiff to be indicted for both murders.

125.    The Defendants procured an indictment against Plaintiff in bad faith and conspired to charge him with falsely committing two unrelated murders in bad faith.

126.    Plaintiff is innocent and has maintained his innocence from the inception of the criminal prosecution against him.

127.    Unfortunately, Plaintiff's wrongful conviction was not an isolated incident.  By the mid-1990s, the NYPD was well aware that arrests and prosecutions tainted by police falsifications were a major problem—one that had been the subject of numerous lawsuits, civil settlements, and excoriating judicial opinions.

128.    In fact, on July 7, 1994—mere months before Plaintiff's arrest—a report by the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures

of the Police Department (the "Mollen Report") had noted that "[p]olice perjury and falsification

of official records is a serious problem facing the Department" that "taints arrests on the streets."

The Mollen Report referred to police falsifications as "probably the most common form of police

corruption facing the criminal justice system" and observed "a deep-rooted perception among

many officers of all ranks within the Department that nothing is really wrong with compromising

facts to fight crime in the real world.  Simply put, despite the devastating consequences of police

falsifications, there is a persistent belief among many officers that it is necessary and justified,

even if unlawful."[7]

129.    The Commission noted that "the Department's top commanders must share the

blame" for the pervasive tolerance of police perjury and falsification.  Yet, the Commission

reported, "[w]e are not aware of a single instance in which a supervisor or commander has been

sanctioned for permitting perjury or falsification on their watch. Nor do we know of a single,

self-initiated Internal Affairs Division investigation into patterns of police perjury and

falsification." (*Id.* at 41). "Changing attitudes about police falsification depends largely on the

Department." (*Id.* at 42).

130.    The Mollen Commission "found a police culture that often tolerates and protects

corruption. We also found that the Department completely abandoned it responsibility to

transform that culture into one that drives out corruption ... (*Id.* at 107).

131.    The pervasive pattern of corruption that the Mollen Commision reported in 1994

– including perjury, "testilying," and falsification of police reports and documents – has

---

[7] Commission Report of the The City of New York Commission to Investigate Allegations of
Police Corruption and the Anti-Corruption Procedures of the Police Department, July 7, 1994
("Mollen Commission Report") (available at
http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-
%20NYPD.pdf).

continued virtually unabated since that time.  Moreover, this pattern of falsification and perjury

has led to numerous wrongful convictions, as occurred in the instant case.

132.    The investigation of the New York State Bar Association's Task Force on

Wrongful Convictions released in 2009 found that "government practices" – referring to a range

of errors and misconduct by police and prosecutors, including false testimony and the failure to

disclose to the defense information mandated by *Brady v. Maryland*, 373 U.S. 83 (1963) –

contributed to more than 50% of the 53 New York wrongful convictions studied by the Task

Force. (NYSBA Report at 19).[8]  In addition, the Task Force identified a much larger number of

cases that "d[id] not reveal an actually innocent person being wrongfully convicted," but

"nonetheless often reveal[ed]" a pattern of "troubling due process violations that may result in a

defendant being denied a fair trial." (*Id.*).

133.    The Task Force found that one contributing factor to the pervasive and far-

reaching problem of *Brady* evidence not being properly disclosed to the defense, as required by

both the state and federal constitutions, was where police failed to make reports of "information

that was viewed by the detective as not aiding the investigation." (Id. at 44).  Yet the police, by

deliberately suppressing and failing to document this sort of information, all but ensure that a fair

trial will not occur, in violation of due process of law. The Task Force observed that

"[p]rosecutors' access to evidence known to the police depends ultimately on the willingness of

the police to record, preserve, and reveal such evidence." (Id. at 37-38).

134.    This widespread disregard for the truth caused the wrongful conviction of

Plaintiff, his co-defendants, and countless others.

---

[8] Final Report of the New York State Bar Association's Task Force on Wrongful Convictions,
April 4, 2009 ("NYSBA Report") (available at
http://www.nysba.org/Content/NavigationMenu42/April42009HouseofDelegatesMeetingAgenda
Items/FinalWrongfulConvictionsReport.pdf).

**Plaintiff's Injuries and Damages**

135.    As a direct and proximate consequence of the aforementioned actions by the Defendants, Plaintiff suffered almost eighteen years of imprisonment.

136.    Plaintiff also suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit.  He was denied effective treatment for his emotional injuries while incarcerated, and continues to suffer mental anguish to this day.  For example, Plaintiff is paranoid and fears the police.  He cannot utilize them for information or to protect him.  His everyday activities are disrupted because he feels compelled to actively avoid contact with law enforcement.

137.    Plaintiff is afraid to be in crowds and gets nervous using public transportation.

138.    It is very hard and anxiety provoking for him to understand and use technology which was passed him by during his incarceration.

139.    Plaintiff was denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family and friends.

140.    Plaintiff is also struggling to gain the trust of other family members and to repair broken relationships.

141.    It is now difficult from him to have healthy relationships with woman.

142.    His daughter grew up without him and, his long absence from her during her formative years caused her to resent him and has negatively impacted her development and Plaintiff's relationship with her.

143.    The elders in Plaintiff's family died during his incarceration.  He was very close with this grandmother who passed while he was in jail.  He had promised her that he would be free before she died, and he feels tremendous guilt for not being able to fulfill his promise.

144.     It has been extremely difficult for Plaintiff to obtain meaningful employment, as his conviction, even though proven to be wrongful, is a problem for employers.

145.     Similarly, Plaintiff was denied years of gainful employment and income.  His earning power and ability to support himself have been permanently hampered by the years of productive work experience his wrongful imprisonment denied him.

146.     Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated.  Nothing can undo the reputational damage he has sustained.

147.     Plaintiff incurred legal costs.

148.     Plaintiff was denied fundamental constitutional rights and has lost his faith in the American justice system.

## FIRST CAUSE OF ACTION

### (42 U.S.C. § 1983; Malicious Prosecution Against Individual Defendants)

149.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

150.     The Individual Defendants initiated, or caused the initiation of, criminal proceedings against Plaintiff.

151.     The Individual Defendants created false information and fabricated evidence likely to influence the grand and petit juries, including but not limited to: (1) the Individual Defendants' fabrication of Ms. Gomez's and Ms. Tavares's statements concerning the source of non-public information they knew about the Raymond and Diop murders; (2) Defendant Aiello's fabrication of Ms. Alexander's testimony, which he and Defendant Donnelly knew to be at odds with video evidence that they suppressed in order to mislead prosecutors, the grand jury and trial jury; and (3) both Individual Defendants' participation in meetings with Cathy Gomez and

Miriam Tavares at which their false testimony was discussed and planned.  Defendants forwarded that information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Plaintiff, even though they could reasonably foresee that their actions would contribute to the prosecutors' subsequent decision to prosecute Plaintiff and obtain his conviction and imprisonment.

152.   The Individual Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to manufacture, testimony which they intended to use against Plaintiff in criminal proceedings, and/or which they caused to be used as a basis for Plaintiff's prosecution and conviction.

153.   The Individual Defendants did so knowing that the testimony was false or was highly likely to be false, and/or with deliberate indifference to whether they were true or false, through the use of constitutionally impermissible, coercive, highly-suggestive, and unreliable interrogation and identification procedures.

154.   Without the false or utterly unreliable testimony which the Individual Defendants wrongfully manufactured and/or knew had been wrongfully manufactured, there would have been no basis to prosecute and convict Plaintiff for the Diop and Raymond murders.

155.   Thus, the Individual Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff.

156.   Additionally, prior to Plaintiff's conviction in 1997, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

157.   The Individual Defendants knew they had duties, under the United States Constitution as well as the laws and regulations of the State and the City of New York, (a) to

disclose *Brady* material to the Bronx District Attorney's Office so that the latter could disclose it to the defense and would not be caused to bring about the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

158.    Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Plaintiff.

159.    The Individual Defendants acted with actual malice, as demonstrated by, *inter alia*: their decision to falsely manufacture probable cause for Plaintiff's arrest and prosecution; their intentional and/or reckless disregard for proper investigative techniques and NYPD policies, including the use of witnesses as language interpreters for one another, failures to voucher evidence appropriately, and the use of unduly suggestive witness identification procedures; their decision to ignore valid evidence and investigative leads that pointed to Plaintiff's innocence; and their willingness to manufacture a false confession from Plaintiff.

160.    The prosecution terminated in Plaintiff's favor when his convictions were eventually vacated and the indictment against him dismissed.

161.    The acts and conduct of the defendants constitute malicious prosecution in violation of the Fourth Amendment to the United States Constitution.

162.    Upon information and belief, the two Individual Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

## SECOND CAUSE OF ACTION

**(42 U.S.C. §1983; Denial of Due Process and a Fair Trial Against Individual Defendants)**

163.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

164.    The Individual Defendants initiated, or caused the initiation, of criminal proceedings against Plaintiff.

165.    The Individual Defendants created false information and fabricated evidence likely to influence the Grand and petit juries, including but not limited to: (1) the Individual Defendants' fabrication of Cathy Gomez's and Miriam Tavares's statements concerning the source of non-public information they knew about the Raymond and Diop murders; (2) Defendant Aiello's fabrication of Kim Alexander's testimony, which he knew to be at odds with video evidence that he suppressed in order to mislead prosecutors; and (3) the Individual Defendants' participation in joint meetings with Cathy Gomez and Miriam Tavares at which their false testimony was discussed and planned.  The Individual Defendants forwarded that information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Plaintiff, even though they could reasonably foresee that their actions would contribute to the prosecutors' subsequent decision to prosecute Plaintiff and obtain his conviction and imprisonment.

166.    The Individual Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to manufacture, testimony which they intended to use against Plaintiff in criminal proceedings, and/or which they caused to be used as a basis for Plaintiff's prosecution and conviction.

167.    The Individual Defendants did so knowing that the testimony was false or was

34

highly likely to be false, and/or with deliberate indifference to whether they were true or false, through the use of constitutionally impermissible, highly-suggestive, and unreliable interrogation procedures.

168.    Without the false or utterly unreliable testimony which the Individual Defendants wrongfully manufactured or knew had been wrongfully manufactured, there would have been no basis to convict Plaintiff for the Diop and Raymond murders, and certainly the jury would have had no confidence in the prosecution's claim of guilt.

169.    The Individual Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff and that false information they caused would be and was used to deny Plaintiff a fair trial.

170.    Additionally, prior to Plaintiff's conviction in 1997, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

171.    The Individual Defendants knew they had duties, under the United States Constitution as well as the laws and regulations of the State and the City of New York, (a) to disclose *Brady* material to the Bronx District Attorney's Office so that the latter could disclose it to the defense and would not be caused to bring about the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

172.    Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed  *Brady* material from, lied about, and otherwise

failed to disclose *Brady* material to Plaintiff.

173.    They did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of the circumstances surrounding the two murders, and of the reliability and the thoroughness, honesty, and professionalism of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's federal constitutional rights.

174.    The aforesaid conduct of the Individual Defendants operated to deprive Plaintiff of his right to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

175.    Upon information and belief, the two Individual Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

## THIRD CAUSE OF ACTION

**(Malicious Prosecution Claim Under New York Law Against All Defendants)**

176.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

177.    Defendants Donnelly and Aiello caused the commencement and continuance of criminal proceedings against Plaintiff.

178.    There was no probable cause for criminal proceedings against Plaintiff, and Defendants Donnelly and Aiello knew or should have known as much.

179.    Defendants Donnelly and Aiello acted with actual malice.

180.    The criminal proceedings against Plaintiff terminated in Plaintiff's favor when his convictions were vacated and the indictment against him was dismissed.

181.   Defendant City is liable under the doctrine of *respondeat superior* for the

unlawful conduct of its employees, Defendants Donnelly and Aiello.

## JURY DEMAND

182.   Plaintiff hereby demands trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly

and severally against Defendants:

183.   Compensatory damages in an amount to be determined;

184.   Punitive damages against the Individual Defendants in an amount to be

determined;

185.   Pre-judgment interest as allowed by law;

186.   An order awarding Plaintiff reasonable attorneys' fees, together with the costs and

disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court; and

187.   Such other further relief as the Court may deem just and proper.

Dated: March 11, 2014
       New York, New York

GLENN A. GARBER, P.C.

By: _____
        Glenn A. Garber

The Woolworth Building
233 Broadway, Suite 2370
New York, New York 10279
(212) 965-9370
*Attorneys for Devon Ayers*